You know, it's an oracle, yeah. So you get one to eat, and that's it. And she'd look at me, and she'd say, I guess I could just watch one of those fishing shows. Ha! I said, maybe for you. Yeah. I'm slime, but I'm slime. That's the most glamorous situation. You know, I used to be a big mother in high school. Thank you. You may be seated. Our last case this afternoon is case number 417-0731, and it is in re the Marriage of Stimson. And we have for the appellant, Ms. Hickey, and for the appellee, Mr. Hopp. You may proceed. Thank you, Your Honor. Good afternoon, and may it please the Court, Mr. Hopp. The defendant in this case is appealing the decision of the trial court in denying relocation and granting the petition for allocation as to one of the children. There are two children in this case, as the Court is well aware, that are subject to the Court's decisions. In finding as the Court did in both the relocation case and the allocation case, the defendant's position that the Court focused on the misdeeds of the mother throughout the trial court case or the perceived misdeeds in those cases, and the rights of the father, instead of focusing on what was very clearly in the best interest of the children. As the Court is well aware, the statute calls for both relocation and allocation for the Court to look at what is in the best interest of the children, not what are the rights of the parties. You're claiming to move the kids without the Court's permission. That's correct. And that is a proper factor for the trial court to consider, right? Yes, yes. Especially under the new statute, yes. When she removed the, under the old statute, the custody statute, when she removed the children at that time, good faith was, good faith removal was not in, or good faith relocation was not in the statute at that time. So when she removed them in August, that was not a factor. Well, the good faith relocation would be tough to argue when the house wasn't foreclosed on until months later. And I assume there was either a, well, I shouldn't assume that. Was there also a lack of notice to the father? There was a lack of notice because she didn't file a petition. Under the old statute at that time, she was not, she didn't have to file a notice, as she does under the new statute. But there wasn't notice because she didn't file a petition. So even under the, old or new, something happened that shouldn't have happened? Correct. She didn't file, right. She didn't file, and that's never been disputed. She did not file for removal of the children. But the reason for that and what she testified to and what her husband testified to as to relocation, or as to why she removed the children for the foreclosure, is that she was told in July that she had a month to get out of the house. And that was what her understanding was. That was what her husband's understanding was. And so she didn't understand or know, and maybe she should have consulted with an attorney, either way she didn't, that she could stay in the home even after foreclosure proceedings. I don't want to get you off your argument, but since you started out with the idea that the trial judge held things against her, was it the trial judge's impression that she also misled the court regarding her relationship with her new husband on the East Coast and her relationship with her family that was going to maybe provide her some support? I don't believe so. I don't believe he thought that she was misleading the court in any way. It was always very clear that they were legally separated. You're saying that the trial judge knew that, that they were legally separated? Yes. Oh, yes. The trial court did seem to have some concern about the representation. I think he referred to it as, you know, this is not an intact family as represented to the court. Do you agree that the trial court did mention that? He did mention that it was not an intact family. And that was something that I addressed in my brief because we don't agree that it wasn't an intact family as far as the relationship with the children was concerned, which is what the focus of the removal decision should have been. Well, the relationship of the stepfather would be a consideration because he's not there. Not only because of separation, but because of travel. Well, and I think that... If they weren't separated, they would still be the way he said he came home once every couple of months? Yes, and he was doing that actually after he got his CDL license before she moved. So you look at... I kind of look at the start of the proceedings when she moved in August. That kind of kicked off what was going on in court. And even before then, he had gotten a CDL license, I believe, a year before that. So even before then and before they were legally separated, he was moving and driving over the road. But to say that an over-the-road truck driver isn't in an intact family, if we apply that to all over-the-road truck drivers, I don't think that is a standard that we can say if you are gone certain days, however many days out of the year, that you're not an intact household. But they were separated, legally separated. So that's an additional...  That is an additional... After he's gone, he's over the road. That's correct, yes. It's an additional consideration. But the evidence showed that his relationship with the children and their co-parenting of the four children, two that were of this litigation and the other two they had together, were very connected. It was a family unit. And even the stepfather went to take the older child when she was in the mental hospital, went to take her on her day passes and things like that when mom was up here with the younger child. And they talked on the phone several times a week, if not daily, with both girls. So even though maybe the relationship, their marriage, they were legally separated, they still had a joint parenting agreement for the younger two children. And they still, the four children all had a great relationship with that father. And that was, again, and that's another part of my argument, is that the best interest of the children, if you look at that, you look at those relationships and you look at where those relationships will, where they'll flourish and where the children will be the happiest. And that was with stepfather. That leads me to my next question, because it seems to me that it could be said that it was reasonable for the trial court to conclude, come to the decision that it did come to, because it seems as if there was alienation going on. And so is it a fair statement to say, well, I've alienated the children against their father so much to the extent that now, you know, they're having mental health problems if they have to be around him. They don't want to be around him. They love it here with me. They want nothing to do with him. Is that how we address that issue, by saying, you know, we reward what you've done and you've destroyed this relationship. And so now we're not going to honor that relationship because it's been destroyed. There was significant kind of push-pull with regard to alienation of the children by the mother or estrangement of the children because of the father's relationship. It was very clear that the father's relationship, the father contributed to the estrangement. He did not foster this relationship. The court even noted that it wasn't, he used the word nurturing, it wasn't a nurturing relationship between the father and these girls. He would have them over to his house. The older child in the very beginning stages of litigation alleged not just the sexual abuse but also intimidation such as punching holes in the walls. She told the custody evaluator that and the guardian ad litem that. Actually the custody evaluator, Dr. Appleton, stated that any intimidation, any kind of fear that was coming to the younger child, Carly, was not coming from the mother. She didn't feel, the custody evaluator didn't feel that the mother was giving this information to the children and then causing that alienation. She felt that it was really coming from the older child. And the older child testified that that was coming directly from her relationship and her experiences with her father. So I think that alienation versus estrangement here, certainly the court should not reward alienation, behavior of alienation. But the degree of alienation here, if any, was very low. It was more the children and their experiences with their father. And that happened because even after Jenna, the older child, was not visiting with the father, the younger child testified at the allocation of responsibility hearing as to what she had experienced over there. She experienced her necklace being pulled off of her person by her father, being videotaped on the phone, her headphones being ripped out of her ears and her phone thrown up the stairs, all that kind of thing. She testified to that on her own. That was after she had been visiting with the father on her own. Jenna was not involved in those visits. And so it's clear that the pattern of abuse and intimidation was coming from the father, not from the mother. Let me ask you a question in this regard. In difficult cases, in any case that involves relocation of children and potentially splitting the children, that's a difficult situation. If I'm a trial judge and I become persuaded that I have to do something and I've got a choice between a mother who my assessment of her is that there are some credibility issues, perhaps I would think that based upon the unfounded sexual abuse report. My dissatisfaction with the living arrangement as it was represented to me, though you've done a good job of explaining another way to look at that. And I think that the present alienation and mental health stability and mental health in general of the older daughter is seriously affecting CS. Do I leave CS with mom? Do I put CS with dad? Or do I remove CS from both of their homes and direct the filing of a juvenile petition? The law would suggest, the policy of the law in the state of Illinois would suggest, I ought to be favoring the biological side and that can only be counterbalanced by really, really serious evidence. And if I buy into or think that there's a persuasive case been made, that JS is actually poisoning or unintentionally perhaps having a really bad effect on CS in terms of relationships and how they view their mother and their father, why isn't it reasonable for me to do what I did? That is, CS is placed in a tough situation where she doesn't want to be, but where she can get counseling. My understanding is there perhaps are other family members that she could relate to as an extended family. Or I can leave her in a situation where the oldest child may not, I mean, she may have continuing problems for the rest of her life. And that is going to affect her. So what do I do? I think the evidence that was presented, especially as to CS in particular, you know, you mentioned the counseling. The evidence, and it was unrefuted, that the plaintiff stated that he was ordered to counseling several times throughout the legal proceedings over two years that I was involved. He was ordered to counseling or there was an order for counseling. And he would go two or three times. There was one incident where he called the, or the custody evaluator called the counselor that she was working with. And the plaintiff had been irate with her over a $9 bill, something like that. So I agree. And certainly the custody evaluator and the guardian ad litem both stated, these kids have to be in counseling. The court stated these kids need to be in counseling. Did they also indicate that it was pointless for dad to participate in counseling, given the alienation that was taking place from mom? My understanding, if the mother were to participate in the counseling, then it wouldn't, the counseling wouldn't work. No, no. I'm saying didn't they indicate that it didn't, it was unnecessary, it was unfruitful, there was no benefit to dad participating in counseling as long as the children were in the care of the mother and she was continuing to alienate them as to their father. She, if they, I believe so, if they were to stay in counseling, but the court ordered that he take them to counseling every week, that that continue. And there were 30 weeks in between the first hearing, well, the first relocation settlement conference and then the hearing. And he went to five of them. I mean, that was after the deposition of Dr. Appleton, who indicated that it may not, counseling may not be successful if the mother continues to have them under her care. But the father, even after that, this was after we received that report and after the deposition, was ordered to go to counseling with the child. And the mother was ordered not to participate in that counseling. So, but he didn't follow through with any of it. And the phone calls, he didn't follow through with any phone calls, any text messages, anything like that, even on her birthday. And again, I do recall some information that there were refusals to speak to dad when he would call. I guess, you know, it can be in a difficult position when you're a judge and you order someone to do something and they don't do it. And you're here arguing that mom was being penalized. But it appears to me that the judge was looking at the big picture and not just looking at who did what I told them to do and who didn't. Truly looking at the best interest, as the trial court saw it, for the children. So, I mean, are you suggesting that as a penalty for not going to the court-ordered counseling, that dad should not have received custody of CS? No, certainly not as a penalty. But as far as looking at what is in Carly's best interest, to take her from the home that she's known for 13 years, put her into a home where she's testified that, you know, there's a pattern of abuse and intimidation where there is a pattern of him not speaking to her. I mean, that was another thing that came out during hearing, is that she was there and he was either at work or he wouldn't speak to her. So she's going from a loving, nurturing environment to this environment where she's only- Except the trial court didn't believe it was a loving and nurturing environment. Because the trial court believed- Let's just start with this premise. Dad is a non-nurturing jerk. Let's say a mom, from the trial court's perspective, was manipulative and caused the original alienation. Some of the alienation is because dad was not nurturing and acted like an ass. A lot of the alienation, from the court's perspective, at least reading what the court decided, looking at the record, he does say mom's accountable for that. He thinks she's manipulative, she's not credible, and she caused the parental alienation. So I'm left with this choice. Neither may be a great choice. And Mr. Popp may argue otherwise, but dad's not going to get a badge of honor from Parents America or some such organization. But what does the trial judge do? And we're in a situation where the trial judge has already decided what ought to be done. How do you overcome that? Telling us that you think the mom's a better person and is nurturing doesn't overcome the record. When you look at our standard of review here, and you're asking us based on the cold record versus the trial court, seeing and hearing the witnesses and their demeanor and considering what they said in conjunction with what other witnesses have said, we're just not in as good a position as the trial court to make this decision. Well, I think part of the issue and part of what we're appealing here is that in deciding the factors as to both relocation, allocation of responsibility, and parenting time, the court in its ruling didn't go into, and it's not necessarily all of the factors, but didn't put enough emphasis on the best interest of the children. But isn't there expert testimony as well as, or reports, as well as things the court could glean from the record or from what else is presented, that it could really be important to get CS away from JS and her mother, away from in terms of living with them and having JS influence her? I mean, some of the evaluators said that, didn't she? In the deposition, she said that that may be helpful, but the evaluator also said that it would not benefit CS to place her in the care of her father. And the custody evaluators, I mean, she kind of at deposition said, I don't know. You know, we asked her point blank questions. She didn't know how to answer it, and here's someone who does this as a living. So, but that it would not be in her best interest to be placed with the father, and especially because the placement with the father was then coupled with completely being cut off from the mother. That was an issue there. So, with the visitation, no calls, no visitation, nothing like that. Nothing was ever set up by the trial court at that time. It's clear that these parties are not going to be able to work it out, and dad's not going to say, oh, sure, you want to see your mom? Okay. So, that was another problem, because she's taken from the home that she's known for 13 years, ripped away from her three siblings that the testimony showed was very close with. They haven't been divorced for 13 years, have they? Well, the mother had been the primary caregiver for her 13 years of life, and they were divorced for about, let's see, it was 2008, so six, seven years. Most of the child's life. Well, do we know what the home was like before the divorce? No. So, we don't have any way of knowing what the relationship was with, the father's relationship with the children. Even if you cut that off and just say it's been the last eight years, I mean, the testimony was that she'd been in the mother's home primarily and every other weekend with the father and a couple of weeks in the summer. So, there was still that primary caretaking and bonding with the other two siblings, the younger siblings that she took care of. Further, what was important as well as that the court really didn't take into consideration as far as the grandparents and the relationship there and the lack of support that the defendant had here in Illinois. She just did not have enough support with her autistic son to be able to take care of her children. There wasn't anybody here to help her, and so she really fell back into a corner when she left, and then the events transpired after that. Counsel, you're out of time, but you will have additional time on rebuttal if you so desire. I appreciate it. Thank you to the court. Mr. Hoff? If it pleases the court, as you all know, I'm Richard W. Hoff. I represent the appellee, Mr. Stimson. Obviously, we have a different position than what you've been hearing about, and that's obvious. I've written a brief, and I've tried to address each and every one of the points that were raised by Ms. Hickey in her argument, which she did very well, and I hope that you've read that. I have references to the pages of the record where I've taken the information. It's about 1,700 pages of record in this case, so I had about three weeks to put it together, and that's one of the downsides of an accelerated type thing. But I agree with the court. The standard of review is, number one, where you're going to start. Is there evidence within the record to support the trial judge's decision? Number one, if we start off with the relocation, you only have to look at the guardian ad litem report by Ms. McCarthy, Dr. Appleton's report, both of them absolutely say she should not be allowed to relocate to North Carolina. The ultimate result of that will be to destroy Mr. Stimson's relationship with his children. And that was a recommendation. Dr. Appleton did a thorough investigation, 70-some pages, I believe, in the record. And in addition, we took her deposition, and she affirmed many of these things. So if we look at that, is there evidence in the record? Absolutely. Do we look at Eckert? And Eckert says, sure. I mean, okay, we've changed removal to now relocation, but aren't the principles the same? I think all of the decisions I've read indicate that they are. We get into motive. Now, I don't care what the motive was when Mom decided to pick up and take off last August, or August of 2015, not last, excuse me. There was no notice. And, okay, notice is not required under that statute. Maybe she should have told Dad where she was going. I mean, this is a joint custody situation. But she packed up with the help of Luke, went down, got a rental truck, and left town. And as I point out, right in the middle of litigation. This case, and I don't remember which family case petition had been unfiled, but certainly the order of protection was filed by her in May. She was being represented actively by Mr. Nuwala with Land of Lincoln Legal Assistance. He didn't know she left. I had to tell him. And how did I find out? Well, one of the neighbors, which, friendly with Mr. Simpson, said, oh, by the way, called him and said, your ex-wife just packed up and moved. And, by the way, the rental truck was such and such. He had to go to the rental truck company, got a copy of the rental agreement. It's attached to one of my exhibits in the petition that I had for her to return to the state of Illinois when I filed that petition for a court order. And, by that, he found out she was moving out to North Carolina where her mother had moved. And I know we say in the petition she was going out to live with her mother. Well, in reality, she moved, according to her testimony in court, 10 miles away or 10 minutes away. Told Dr. Appleton it was 15 minutes away. Help from the mother, meaning the grandmother of these children. There was no testimony at all of what help she received from the grandparents. So we would be left to speculate or guess if there was any help whatsoever. So was the judge upset? Well, you have to put that in perspective. She didn't come back until sometime in October. And then only when ordered specifically to come back with those kids by Judge Correal. John Erickson was her attorney at that point. And Mr. Erickson and I worked out a temporary agreement to allow her to be out of state. Why? Because Dad thought it was in the children's best interest to complete the school term that they had already started in North Carolina. As part of that agreement, now you get into the issues of counseling and alienation and what have you. She was, by agreement, to bring those kids back so Dad could visit every other weekend and go to counseling. He was to have holiday visitation. And the first time that she returned to the state of Illinois, with CS only, I'm getting used to the initials, was, I believe, January 26 or 27 of 2016. And then again by specific order that she returned. We filed a contempt petition. She was found in contempt for her failure to comply with that order. And at that point, Mr. Stimson had seen his kids in May. Saw both kids in November after the temporary order was entered. Never saw his oldest child again unless she appeared in court to testify. No visitation. No time with her. And then he saw his youngest, CS, in January when Judge Correo ordered the weekend visitation to resume. Now, we have all of these arguments when we go in. We have, oh, an intact family. Well, look at Luke's testimony. I have that pretty much spelled out. And Luke was a witness that was called by Miss Hickey's client. And Luke testified that the reason that he used the address in North Carolina, meaning Miss Whitaker's address, was because he had a CDL. He needed to transfer it. It was a temporary license from Indiana. In order to get a license in Illinois, he had to retake the test. It would take about a week. But in North Carolina, he could get it immediately and did not lose, then, a month from the loss of work. He testified that Miss Whitaker allowed him to use the residence because he had to have something for a North Carolina license, and that he came back once every couple of months to visit his children that he had with Mrs. Whitaker. He did say he talked on the phone with the others and he had a good relationship with them. Is that an intact family? Had that legal separation? I don't think so. He denied he was living with her. And that is Mrs. Whitaker's separated husband and her witness. One would assume that prior to court, they would have had it together a little bit. You look at some of the rest of these things, and we say, oh, but Mom was the primary caretaker of C.S. Was she? The judge ordered C.S. return to Illinois, as we know from the record, and she was returned January 2016. As of the hearing in August, and also the second hearing that we had, the relocation and then the modification of parental responsibilities, Mom testified she was a resident of North Carolina. Had no residency here in the state of Illinois. Where was C.S.? C.S. was attending school in Mount Zion. That's a long way from North Carolina. She was asked, meaning Mrs. Whitaker was asked, where do you stay when you're here? She had some people that she stayed with in the beginning, and then she was staying in hotels, and at the end, the child was staying with the former Mount Zion police officer, Mrs. Gash, and had been there for a stretch of about six weeks. Loving home, nurturing home, primary caretaker. She's in North Carolina. The child is here. I think that as of January 2016, she lost that badge. She was no longer the child's primary caretaker. If we look at, and I look at with interest Justice Connick's questions about no good choice, and that I would argue that Mr. Stimson was father of the year. I can't argue certain things with a straight face. Even as a lawyer, that gets a little tough. I think that Judge Correale was very perceptive in this case. I mean, he had this case for two years. He went through all of these hearings. I don't see that he missed a beat on it. And when he said, I don't have any good choices, I have an older child that's been in a mental institution for six or seven months out in North Carolina, and I think by the second hearing, she was finally back in the public high school, but that was the first time. Other than that, she'd been homeschooled from when she went in in January 2016. Now, did he force the child back? No, it's not in her best interest. Leave her, have mental health care in North Carolina. Well, then when she got out, she had intensive therapy, and that was all homebound. She had homeschooling and not back in school, despite the argument that she's doing well in school. Dr. Appleton said, no, she's doing terrible with both her personal life, obviously, and her schooling. Terrible situation. Dr. Appleton received the records from the institution where J.S. was. She read them. You can see her refer to them in the deposition in her report. She even commented on it. As to all of those records, she got the ones from Heritage. Child went into Heritage. J.S. went into Heritage. Why did the child go into Heritage? She was cutting herself. She cut herself in her father's house at one point. That was in May or April or May of 2015. Mom says that's lack of supervision in her argument, except Mom knew she was cutting herself in March but didn't tell Dad. He didn't know it. You don't cut yourself in public. You do it back in a bedroom. As Dr. Appleton said, a child of this age is going to require a certain amount of privacy. I think it's appropriate. Maybe more supervision would have been appropriate if he had knowledge of it, which he did not. So we get into this, and why did the child go to Heritage? Well, I'm having trouble with my dad. Okay, what happened in May? That's the sexting incident. That was where Dad found the sexting incident on the phone and obviously got upset with his daughter and brought that up as an issue, called Mom, who said you made it all up. She disavowed it. That's in Helen Appleton's report. By the way, J.S. never came back for a visitation until October. And that's when the first order of protection came in, which was dismissed. Then she filed in North Carolina. My client, Mr. Stimson, went all the way to North Carolina, hired a lawyer, showed up for the hearing, and Mrs. Whitaker didn't. Now we have the third order of protection that we get here in Macon County. That's over the alleged sexual and physical abuse of J.S. All right, when did that occur? It occurred right after Mom had a visit with her in the mental institution, admittedly pulled out pictures, here's your back, here's your bruise, this is your dad's handprint. Immediately thereafter, she goes and says to the therapist, my dad sexually abused me. Never had said anything like that before. Why? We call that parental alienation. Why did she come up with that? When I asked Dr. Appleton about that, and the deposition and everything, well, even the handprint appears to be too small for Mr. Stimson. And do you believe that this is coincidental, i.e., that she is shown a handprint on her back by her mother, and all of a sudden she alleges these things about her father? No. Not coincidence. Dr. Appleton did a thorough evaluation of it. She said in her deposition, I believe that she has done more than 8,000 evaluations of sexual abuse. She said in her deposition, the chances of Mr. Stimson having abused this child sexually slim to none. Where was C.S. getting it from? Her sister. In fact, if you go a little further, C.S.'s behavior, sitting in her room, talking on her phone, not communicating, where does that come from? Her sister. That's what her sister told her therapist, according to Dr. Appleton, out in the mental institution, that she would do if she was forced to do it. Counseling take care of it? Well, let's see. We were supposed to come back every other weekend, starting with that temporary order, but the kids were in North Carolina. The older one never came back. The other one did. Mr. Stimson's going to counseling. That's in the record. But he's the only one doing it, because she didn't bring him back for counseling. So that did get discontinued. And then I hear reference to, well, he didn't go to counseling in October of 2016. Well, he didn't know about the counseling until he got the bill. Yeah, he was irate that he got a bill that he didn't even know about. It had nothing to do with the counseling. Talked to Dr. Appleton about it and resumed counseling in January 2017. Went to Mrs. Webb, I think, five times, Evelyn Webb, and told him, I'm discontinuing it. It's useless because of the manipulation of Mrs. Whitaker. And I asked Dr. Appleton in her deposition, is there any reasonable expectation, I've got that quoted in my brief, that counseling will succeed while she's with her mother, meaning CS? Not really, no. That's basically what she said. And that's when Mr. Stimson discontinued, based upon what Mrs. Webb told him, the counseling. Now, phone calls. You continue to call when nobody will talk to you? That's in there, too, the testimony and the record. He called maybe about five times, but nobody would talk to him, so, yeah, he discontinued it. Does Dad have a great relationship with CS, as the judge pointed out, as Judge Correale pointed out? Not really. Well, that's over about, this thing started in May of 2015. We recorded in August and September of 2017. Yeah, the relationship went like this in that period of time. What are the good choices? And I do remember, and I will give you this, Judge Correale said to me, basically, I suppose you're going to come in and argue that both these children ought to be placed with their father, and that's in their best interest. And I said, Judge, I have a number of options. I said, that's one. Maybe not a good one. Dr. Appleton said the girls shouldn't be together, that the older one was a bad influence on the younger one. So maybe we need to separate them, and that could be a number of choices. Leave one with Mom, leave one with Dad, have visitation where the children are not necessarily together, and counseling to bring it together. How can that be solved? She needs to move back from North Carolina to Illinois. She was not granted permission to live there with the child. She was there, I will put it that way, at the time of the hearing with the oldest. No reason. Move back to Illinois by the judge's order? No, we're not going to do that. What are the other choices, getting back to the options? Give CS to my client, leave the other one where she is, and try to resolve this through counseling with the mother returning to Illinois. We had a number of choices. The judge picked, and I had no good ones. Realistically, the best choice out there was separate the girls. That's Dr. Appleton's recommendation. He did leave one with the mother. I'm not sure that's a good idea, but he did. Put the other one with Dad, which is what he did. And then at this point, he's got a temporary order that says no contact with Mother until we can figure out how to supervise it so she doesn't continue to poison the relationship. That's what happened after. That's not on the record, so we won't go into it. But I think there are a number of these problems, and in my opinion, with whatever that's worth, 46 years of practice, April 11th, I've never seen a worse case of parental alienation in 46 years. And I hope that says something. Questions? I've been batting my gums. I don't see any. Did you have one? I have no questions. Thank you, Mr. Hoppe. Thank you. Do we have a vote on the speaking? Yes, thank you. Very briefly, a few things that Mr. Hoppe covered in his argument that I'd like to discuss. First thing is he stated that the report of the guardian ad litem, Kitty McCarthy, stated that it was in the best interest of the children to leave. She did three different reports over this time period. The first two said that the father should not have unsupervised visitation with the children, that the children should not be forced to go with the father. Both experts said that both times. And also, her first two reports stated that removal was in the best interest of the children because if you remove the children, then they aren't resenting their father. They're old enough to kind of resent their father, unfortunately. They're not resenting the father, and they're able to heal that relationship. The first two reports said that after Dr. Appleton said that she was not in favor of relocation, then the guardian ad litem changed what she thought at that point. So the first two were in support of that relocation. Mr. Hoppe stated that there was no testimony of what help she received from the grandparents. In the record, that's actually at 288 and 289 of the transcript of the testimony, she testified that she had the autistic child, that her parents were able to help, and that her parents helped out and lived 10, 15 minutes away from her. So that was actually in the record, and she did testify to that. And I believe her husband, I don't have the site for that, but her husband testified to that as well. So testifying that they provide help and they live close, what help do they provide? I mean, I thought there was something about grandma had an art studio. Somebody enjoyed that. But help to me is getting the kids to school, taking them to appointments, doing the kinds of things that she didn't have the time to do if she was working or caring for the autistic child. So did she amplify on that or just say, or just assert, I get help from my parents? I don't believe she went into it any further. I think it was just that she does receive the help and that they do live close and are able to help if needed. Mr. Hoppe stated that the TS missed some visits, and she did. That was certainly, she missed visits up until January of 2016, and there was some resistance to visits until July of 2016. But July 2016 to August 2017, when we tried the case, there was only one weekend that was missed. So the defendant was certainly complying with the court orders at that time, and the relationship was continuing with the father. And for Mr. Hoppe to say that the plaintiff, I'm sorry, never saw the oldest child, the guardian ad litem actually spoke with the counselors in North Carolina, and the guardian ad litem, the counselors told her that they didn't recommend that the older child have any visits with the father, that she wasn't strong enough to handle that at that time. So that's the reason why that happened, and she was in the hospital under intensive mental health treatment for six to seven months. Again, just another of the extraordinary things in this case. As to the sexual abuse, Dr. Appleton found that where she didn't believe that any abuse had happened, she did believe that Jenna had felt that she had had a trauma. And that was the most important thing. Dr. Appleton did not say that it came from Jamie. It said that it could have happened in the hospital, could have been in her deposition. She stated that it could have been something that happened in a group therapy session. You know, you get these ideas and you think that. But regardless of where it came from, that it was not, that she believed she had the trauma, and that was the part that needed to be treated, not the trauma itself. And finally, as to the cutting for Jenna and the issues that were had there, yes, there is an expectation of privacy, but it's clear that if you're not paying enough attention to be able to catch this behavior, but Mom was the one who found it, and Mom was the one that was able to get her help and get her into the hospital that she needed. So I would argue that the environment with the mother was more safe and secure, and the girls felt that it was more safe and secure than the environment with the father. Thank you. Thank you, counsel. We'll take this matter under advisement and be in recess.